J-S02023-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MARQUEL I. AZOR-ORTIZ | : | |
| | : | |
| Appellant | : | No. 874 MDA 2019 |

Appeal from the Judgment of Sentence April 11, 2019
In the Court of Common Pleas of Berks County
Criminal Division at No(s):  CP-06-CR-0001131-2018

BEFORE:  BENDER, P.J.E., KING, J., and MUSMANNO, J.

MEMORANDUM BY KING, J.:                    **FILED FEBRUARY 20, 2020**

Appellant, Marquel I. Azor-Ortiz, appeals from the judgment of sentence entered in the Berks County Court of Common Pleas, following his jury trial convictions for possession of a controlled substance and possession of a controlled substance with the intent to deliver ("PWID").[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Appellant raises the following issue for our review:

> WHETHER THE COMMONWEALTH FAILED TO PRESENT
> SUFFICIENT EVIDENCE TO SUPPORT GUILTY VERDICTS FOR
> [PWID] AND POSSESSION OF A CONTROLLED SUBSTANCE
> AS NO EVIDENCE WAS PRESENTED AT TRIAL TO SHOW
> THAT [APPELLANT] INTENTIONALLY OR KNOWINGLY

---

[1] 35 P.S. § 780-113(a)(16), (30).

POSSESSED THE DRUGS AT ISSUE.

(Appellant's Brief at 5).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Paul M. Yatron, we conclude Appellant's issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of the question presented. (*See* Trial Court Opinion, filed October 9, 2019, at 7-9) (finding: Commonwealth established constructive possession where Appellant was driver of vehicle in which police found drugs, and Appellant's intercepted phone calls demonstrated his knowledge of drug delivery scheme; further, police discovered $30,000.00 in safe located in would-be buyer's residence; evidence was sufficient to sustain Appellant's convictions). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/20/2020

- 2 -

COMMONWEALTH OF PENNSYLVANIA : IN THE COURT OF
: COMMON PLEAS OF BERKS
: COUNTY PENNSYLVANIA
v. : CRIMINAL DIVISION
:
: No. CP-06-CR-00001131-2018
MARQUEL AZOR-ORTIZ, :
Appellant : PAUL M. YATRON, JUDGE

**1925(a) Opinion**                                        **October 8, 2019**

Before this court is Appellant's Concise Statement of Errors Complained of on Appeal. For the reasons set forth herein, we find that all errors lack merit and request that the Superior Court dismiss the appeal.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Appellant was charged with one count of Possession with Intent to Deliver a Controlled Substance[1] and one count of Possession of a Controlled Substance[2] – both for the Schedule II controlled substance crystal methamphetamine.

At trial, the Commonwealth presented Special Agent Sean Canavan ("Agent Canavan"), an eighteen-year veteran of the U.S. Drug Enforcement Administration ("DEA") who testified that during the fall of 2017, he was participating in a Title III investigation ("the wiretap investigation")[3] out of the New York Field Division in New York City.[4] (Notes of Testimony of Jury Trial Held April 10-11, 2018 "N.T." at 22-23). The wiretap investigation involved an individual named Gerardo Camilo-Nolasco who was a known narcotics trafficker out of the Bronx area of New York. (N.T. 28). While monitoring Mr. Camilo-Nolasco's phone over the course of several weeks, Agent Canavan became aware of two other individuals named Jalil Jacques and Appellant, Marquel Azor-Ortiz. *Id.* Jalil Jacques was believed to be a customer of Mr. Camilo-

---

[1] 35 P.S. § 780-113(a)(30)

[2] 35 P.S. § 780-113(a)(16)

[3] Agent Canavan described a "Title III investigation" as investigation that go "through the courts legally to get to phones on suspected narcotics traffickers," otherwise known as wiretap investigations, and testified that he had participated in at least a hundred of such investigations. (N.T. 23-24).

[4] Agent Canavan was qualified as an expert witness in the area of drug culture, the use of narcotics and delivery, and specifically to give his opinion as to the content of recorded conversations admitted into evidence. (N.T. 25).

1



Nolasco and Agent Canavan had observed the two meeting in the Bronx earlier in the investigation. (N.T. 35-36).

Agent Canavan testified that phone calls and text messages were intercepted on February 9 - 10 of 2018 during which Agent Canavan believed that Mr. Camilo-Nolasco and Mr. Jacques were discussing a shipment of drugs from Mr. Camilo-Nolasco in New York to Mr. Jacques in Reading.[5] (N.T. 41). Based on the phone calls, Agent Canavan understood particular coded language being used to indicate that Mr. Camilo-Nolasco had four pounds of crystal methamphetamine that he wanted to sell for $5,000 a pound.[6] (N.T. 44). Mr. Jacques indicated that he only had $10,000 to pay for two pounds and that he would pay for the other two pounds at a later date. *Id.* Mr. Camilo-Nolasco also asked Mr. Jacques to send him the address, to which Mr. Jacques responded with "1102 Franklin street reading pa 19604." (N.T. 39; Ex. C-4 at 7; Ex. C-5 at 20). At approximately 4:04 p.m. on February 10, 2018, Mr. Camilo-Nolasco placed a phone call to Appellant in which he asks Appellant if he "put away the clothes," to which Appellant responds that he did and when Mr. Camilo-Nolasco asks Appellant about the GPS, Appellant tells Mr. Camilo-Nolasco that he hadn't used the GPS yet, but was doing it at the time. (Ex. C-4 at 2). Mr. Camilo-Nolasco then scolds Appellant that he should "hurry up. I told him that you'd get there by six thirty." *Id.*

Based upon the investigation, Agent Canavan contacted DEA agents in the Allentown, Pennsylvania office to inform them of the impending shipment of drugs. (N.T. 43). Agent Canavan was aware that, based upon his communication with the DEA agents in Pennsylvania, the drugs were eventually seized, and Appellant arrested in Reading. (N.T. 45).

After the seizure of the drugs and arrest of Appellant, Agent Canavan intercepted another phone call between Mr. Camilo-Nolasco, Mr. Jacques and an unidentified female on Mr. Jacques end of the phone call that occurred on February 10, 2018. During the phone call, Mr. Jacques explains that law enforcement came to his house and took his money and asked him about someone coming from New York to meet him. (Ex. C-4 at 17-18, 21). Mr. Camilo-Nolasco repeatedly asks

---

[5] A recording of the phone calls, some of which were translated from the Spanish language, as well as transcripts of both the phone calls and the text messages were entered into evidence and published to the jury during trial.

[6] Agent Canavan testified that coded language is used by drug trafficking organizations during phone calls to make the conversations seem innocuous when discussing drug transactions so as to avoid detection. (N.T. 48-49).

2

about his "guy" and whether his "friend" was arrested. *Id.* at 22. Mr. Jacques and the unidentified female complain several times that Mr. Jacques never asked anybody to meet him at his house, but that somehow law enforcement knew where he lived and about his car. *Id.* at 22-23. Moreover, all parties express vexation at the fact that law enforcement did not allow the transaction to occur and wonder at how law enforcement knew about Appellant and his vehicle and about Mr. Jacques' address and vehicle. *Id.* at 23.

The Commonwealth next called Special Agent Robertjohn Wohlbach ("Agent Wohlbach") of the DEA who was working out of the Allentown Resident Office. (N.T. 52-52). On February 10, 2018, Agent Wohlbach was traveling in the Bethlehem/Easton area when he received notification from Special Agent Josh Romig out of the Allentown office that an individual would be traveling from New York City to the Reading, Pennsylvania area and that this individual would have certain amounts of methamphetamine with him. (N.T. 53-54). As Agent Wohlbach was traveling to Reading, he noticed a black Toyota Camry ("the Vehicle") with New York State license plate traveling south on Route 222. (N.T. 54-55). Agent Wohlbach noticed that the license plate on the Vehicle was a "TLC" plate indicating that the Vehicle would be licensed as a for-hire transit vehicle similar to a taxicab. (N.T. 55). Agent Wohlbach could not immediately identify the driver, but could see that the male driver was the only occupant of the vehicle. (N.T. 55-56).

Having been informed from Agent Romig that the expected destination of the suspected vehicle from the New York Field Division investigation was 11th and Franklin Street in the city of Reading, Agent Wohlbach continued to follow the Vehicle and simultaneously input the coordinates into his GPS unit, which indicated that the Vehicle was following a similar route to that destination. (N.T. 56). As the Vehicle turned onto Franklin Street near Fourth Street, Agent Wohlbach noticed the Vehicle pull to the side of the road, so he pulled up further along the street to avoid detection, but lost sight of the Vehicle. (N.T. 57).

A few minutes later, Agent Wohlbach received notification from Agent Romig that the Vehicle was now in the 1100 block of Franklin Street and he proceeded to that area where he observed the Vehicle had been stopped by the DEA and Reading Police. (N.T. 57-59). When Agent Wohlbach arrived on scene where the Vehicle had been stopped, he observed the driver speaking with DEA agents and law enforcement and shortly thereafter, the Vehicle was searched. (N.T. 59-60).

3

Agent Joshua Romig ("Agent Romig") of the Allentown DEA office testified that he was contacted by Agent Canavan on February 10, 2018 regarding the wiretap investigation out of the New York Field Office during which it was learned that an individual would be traveling from New York City with between two and four pounds of methamphetamine for delivery to an individual in Reading, Pennsylvania identified as Jalil Jacques. (N.T. 62). After having been informed that the individual travelling from New York City was supposed to meet Mr. Jacques at 1102 Franklin Street in Reading, Agent Romig and several other DEA agents and Reading city police officers proceeded to surveil the Franklin Street location. (N.T. 63-65). Agent Canavan had informed Agent Romig that the individual from New York City was supposed to arrive around 6:30 p.m., and Agent Wohlbach had radioed regarding the Vehicle with New York TLC plates that he was following in a direction toward Reading. (N.T. 64). Therefore, Agent Romig suspected that the Vehicle Agent Wohlbach was following could likely be the individual from the investigation whose arrival they awaited. *Id.*

The Vehicle arrived at the Franklin Street location at approximately the same time as indicated by Agent Canavan. (N.T. 64). Agent Romig and a Reading officer then approached the Vehicle in a marked patrol vehicle with lights and sirens activated. (N.T. 65). Agent Romig exited the marked police car and approached the Vehicle. (N.T. 66). As he did, the driver, identified as Appellant, quickly exited the Vehicle, without being asked to do so, and stared at Agent Romig "like a deer in headlights." (N.T. 67-68). Agent Romig then ordered Appellant to the ground where Appellant was secured in handcuffs. N.T. 68. Appellant was placed on a stoop on the sidewalk. (N.T 68-69).

Agent Romig looked into the Vehicle from the open door and observed two mobile phones on the dashboard of the Vehicle, which he then seized. (N.T. 68-69). One phone was operating as a GPS and the other was actively receiving incoming calls. (N.T. 69). When asked where he was going, Appellant stated in broken English that he was going to where he was. (N.T. 69-70). Another officer asked Appellant to unlock his mobile phone, which Appellant did with his fingerprint and the GPS indicated that the address Appellant was heading to was 1102 Franklin Street in Reading. (N.T. 70). The other mobile phone was receiving incoming calls from the number Agent Romig recognized as the target of the wiretap investigation. *Id.* The mobile phones were taken into evidence and later processed. (N.T. 70-71). The Vehicle was subsequently searched by Task Force Officer John Casella during which a black bag with two clear plastic bags

4

containing crystal methamphetamine was found in the wheel well of the trunk of the Vehicle.[7] (N.T. 71).

Thereafter, Appellant was transferred into the custody of the Reading City Police Department, along with the evidence seized. (N.T. 75). The Vehicle was transferred to the Reading City Police Department impound lot. *Id.*

Once Appellant was transferred, Agent Romig then went to 1005 ½ Franklin Street, which was approximately a block west of where Appellant and the Vehicle were stopped, looking for Mr. Jacques. (N.T. 76). Initially, Mr. Jacques' girlfriend answered the door, but Mr. Jacques eventually came to the door and consented to a search of his bedroom after Agent Romig told him that law enforcement was conducting a drug investigation and that he was suspected of having the money for the drugs. (N.T. 76-77). Mr. Jacques then directed Agent Romig to a safe in his bedroom where law enforcement found and seized over $30,000. (N.T. 77-78).

Detective Scott Errington ("Detective Errington") of the Berks County District Attorney's Office Narcotics Unit, who was qualified as an expert in the field of narcotics investigations in order to render his opinion as to whether the drugs in the instant case were possessed with the intent to deliver and on terminology used in the drug culture, testified that the amount of methamphetamine possessed by Appellant in the Vehicle is an indication that the drug was possessed with the intent to deliver. (N.T. 90-91). Specifically, Detective Errington testified that a typical dosage unit of methamphetamine might be a fraction of a gram with a decent size at a quarter of a gram. (N.T. 91). With over 1,300 grams of the drug found in the Vehicle that Appellant was driving, Detective Errington opined that the amount would be more than a typical user would consume in a few years. *Id.* Furthermore, Detective Errington stated that it is typical for couriers and drug organizations to utilize hiding spots for drugs, like the trunk of a vehicle, where law enforcement won't be able to see them if the vehicle is stopped for a traffic violation. (N.T. 92-93).

Detective Errington further testified as to the terminology and coded language used between individuals that is common in the drug trade. (N.T. 93). Individuals in the drug trade will

---

[7] The parties stipulated to the chain of custody and chemical testing of the substance found in the Vehicle, which was determined to contain 1334 and nine tenths grams of methamphetamine — a Schedule II controlled substance. (N.T. 84-86).

use the coded language during phone conversations in an attempt to elude detection by law enforcement. *Id.* Detective Errington testified that in the conversation between Mr. Camilo-Nolasco and Appellant, the reference to "clothes" was meant to denote the drugs that were being transported in the Vehicle and that putting "the clothes away," was referring to hiding the drugs in the trunk of the Vehicle. (N.T. 96).

At the conclusion of the jury trial, Appellant was found guilty on both counts. Thereafter, this court sentenced Appellant to a minimum of five years and a maximum of ten years of incarceration in a State Correctional Facility. Appellant was RRRI eligible reducing his minimum to fifty months.

On May 10, 2019, Appellant filed a Notice of Appeal with the Pennsylvania Supreme Court, which was then transferred to the Superior Court for filing. After an order from the Superior Court, we appointed the Berks County Public Defender's office to represent Appellant on appeal. On September 9, 2019, we issued an order directing Appellant to file a Concise Statement of errors complained of on appeal pursuant to PA.R.A.P. 1925(b).

On September 17, 2019, Appellant, through counsel, filed a Concise Statement of Errors Complained of on Appeal. Appellant alleges the following error of the court:

1. The evidence was insufficient to support the guilty verdicts for the counts of Possession with Intent to Deliver a Controlled Substance and Possession of a Controlled Substance, where the Commonwealth did not establish by direct or circumstantial evidence the requisite elements of Possession with Intent to Deliver a Controlled Substance and Possession of a Controlled Substance, specifically, that [Appellant] intentionally or knowingly possessed the drugs at issue where there was no testimony finding [Appellant] in actual physical possession of the drugs, no testimony of any physical interaction between Gerardo Camilo-Nolasco and [Appellant], and no evidence of fingerprints or DNA on the drugs or packaging recovered in this case.

(Appellant's Concise Stmnt. ¶ 1). We provide this opinion pursuant to Pa.R.A.P. 1925(a).

6

# DISCUSSION

## Sufficiency of the Evidence

Appellant alleges that the evidence was insufficient to support the verdicts of guilty as to both counts on the same basis. Specifically, Appellant challenges the sufficiency of the evidence to support a finding that he intentionally or knowingly possessed the illegal drugs citing three different bases for this challenge. First, that there was no testimony as to his actual possession of the illegal drugs. Second, that there was no testimony or physical evidence of an interaction between Appellant and Gerardo Camilo-Nolasco. Finally, Appellant challenges the sufficiency of the evidence because there was no evidence of fingerprints or DNA found on the illegal drugs or the packaging recovered in the case. In reviewing a challenge to the sufficiency of the evidence:

> We review the evidence in the light most favorable to the verdict winner to determine whether there is sufficient evidence to allow the jury to find every element of a crime beyond a reasonable doubt.
>
> In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a Appellant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Soto*, 202 A.3d 80, 93 (Pa.Super. 2018), *appeal denied*, 207 A.3d 291 (Pa. 2019). "Because evidentiary sufficiency is a matter of law, [the Superior Court's] standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa.Super. 2018), *appeal denied*, 202 A.3d 42 (Pa. 2019).

Section 780-113(a)(30) of the Controlled Substance, Drug, Device and Cosmetic Act prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance." 35 P.S. § 780-113(a)(30). A "controlled substance" is defined under the statute as "a drug, substance, or immediate precursor included in Schedules I

7

through V of this act." 35 P.S. § 780-102. Pursuant to the statute, Methamphetamine is a Schedule II substance. *See* 35 P.S. § 780-104. "To sustain a conviction for possession of a controlled substance with intent to deliver, the Commonwealth must establish the Appellant knowingly or intentionally possessed a controlled substance without being properly registered to do so, with the intent to manufacture, distribute, or deliver it." *Commonwealth v. Dix*, 207 A.3d 383, 390 (Pa.Super. 2019).

> In Pennsylvania, the intent to deliver may be inferred from possession of a large quantity of controlled substance. It follows that possession of a small amount of a controlled substance supports the conclusion that there is an absence of intent to deliver. Notably, if, when considering only the quantity of a controlled substance, it is not clear whether the substance is being used for personal consumption or distribution, it then becomes necessary to analyze other factors.

*Commonwealth v. Lee*, 956 A.2d 1024, 1028 (Pa.Super. 2008)(citation and quotation marks omitted).

> [The Superior] Court has held that possession can be found by proving actual possession, constructive possession, or joint constructive possession. Where a Appellant is not in actual possession of the prohibited items, the Commonwealth must establish that the Appellant had constructive possession to support the conviction. Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. [The Court has] defined constructive possession as conscious dominion, meaning that the Appellant has the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Commonwealth v. Parrish*, 191 A.3d 31, 36 (Pa.Super. 2018), *appeal denied*, 202 A.3d 42 (Pa. 2019).

Because Appellant was not in actual possession of the drugs, the Commonwealth was required to prove that Appellant had constructive possession of the drugs. *Commonwealth v. Dix*, 207 A.3d 383, 390 (Pa.Super. 2019), *appeal denied*, 211 EAL 2019, 2019 WL 4164778 (Pa. Sept. 3, 2019). In so doing, the Commonwealth may establish through the totality of the circumstances that a defendant had the power to control the contraband and the intent to exercise that control. *Dix*, 207 A.3d at 390.

In the instant matter, Appellant was driving the Vehicle in which the drugs were found. There are communications between Appellant and Mr. Camilo-Nolasco, a known drug trafficker, in which, according to the investigators and the Commonwealth's expert, the two discussed hiding

the drugs during transportation and arriving at the correct location for the transaction. The DEA investigation yielded a date, time and place at which the transactions was purported to take place and Appellant, driving the Vehicle with New York license plates, arrives at the exact time and place indicated. When Agent Romig began to approach the Vehicle that Appellant was driving, Appellant immediately exited the Vehicle and stared at Agent Romig with a look like "a deer in headlights." After taking Appellant into custody, law enforcement finds Mr. Jacques, with whom Mr. Camilo-Nolasco has been communicating regarding the drug transaction, with over $30,000 in his safe. Given the totality of the circumstances, and the inferences drawn therefrom, we find that the evidence presented by the Commonwealth was sufficient to support a finding that Appellant had conscious domain over the methamphetamine found in the Vehicle and therefore, constructively possessed the drugs.

## CONCLUSION

For all of the foregoing reasons, this Court respectfully requests that the instant appeal be **QUASHED** or otherwise **DISMISSED**. We submit the record of this case for review.

9